UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
EMANUEL SUVILL and RASHAN
BESWICK individually and on behalf of
other persons similarly situated who were
employed by BOGOPA SERVICE
CORP. /d/b/a FOOD BAZAAR and
FOOD DIMENSIONS, HWEE III AM,
or any other entities affiliated or controlled
by BOGOPA SERVCE CORP.
and/or HWEE III,

                      Plaintiffs,

                - against -

BOGOPA SERVICE CORP. /d/b/a
FOOD BAZAAR and FOOD
DIMENSIONS, HWEE III AM, or
any other entities affiliated or controlled
by BOGOPA SERVCE CORP.
and/or HWEE III,
                    Defendants.
-----------------------------------------------------------X

**MEMORANDUM & ORDER**
No. 11-cv-3372 (SLT) (RER)

**TOWNES, United States District Judge,**

        Plaintiffs—Emanuel Suvill and Rashan Beswick—commenced this putative class action

claiming that Defendants—Bogopa Service Corp. d/b/a Food Bazaar and Food Dimensions and

Hwee III Am (collectively "Food Bazaar")—violated various provisions of the Fair Labor

Standards Act ("FLSA") and the New York Labor Law ("NYLL").  Presently before the Court is

the Report and Recommendation ("R&R") of the Magistrate Judge recommending certification

of plaintiffs' class, as modified by the Magistrate Judge.  (Docket Nos. 40 & 51).  For the

following reasons, after reviewing the objections of the parties and the R&R, this court declines

to adopt the Magistrate Judge's recommendation and denies plaintiffs' motion for class

certification.

## I.    Standard Of Review Pursuant to 28 U.S.C. § 636

A district court "shall make a *de novo* determination of those portions of the report or …
recommendations to which objection is made."  28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P.
72(b)(3) ("The district judge must determine *de novo* any part of the magistrate judge's
disposition that has been properly objected to.").  After performing this inquiry, the court may
"accept, reject, or modify, in whole or in part, the findings or recommendations made by the
magistrate judge." Fed. R. Civ. P. 72(b)(3).  The court has received objections and accordingly
conducted a *de novo* review.

## II.    Factual Background

The parties agree that defendant, Bogopa Service Corp., owns and operates seventeen
supermarkets in the tri-state area.  This is practically all that the parties agree upon.

Plaintiffs allege that they primarily worked outside of defendants' supermarkets, helping
to carry customers' groceries, remove snow and ice, assist with security, perform deliveries,
clean platforms and parking lots of debris and trash, and collect shopping carts. (Suvill Decl. ¶ 2;
Rashan Decl. ¶ 2.)  Food Bazaar's managers occasionally directed some of the plaintiffs to
perform various tasks inside the supermarkets, including bagging groceries, manning the bag-
check booth, cleaning cash registers, and sweeping inside the store.  (Suvill Decl. ¶¶ 5-6; Rashan
Decl. ¶¶ 5-6; Hernandez Decl. ¶ 4.)  For this work, they received no wages from Food Bazaar,
but instead were compensated solely by customer tips. (Suvill Decl. ¶ 13; Rashan Decl. ¶ 16.)

Defendants respond that plaintiffs were not employees.  Rather, they assert that plaintiffs
loitered outside Food Bazaar stores, hustled customers for tips, and occasionally stole beer.
(Ahn Decl.; Ahn Dep. 114:20-115:25.)  Defendants assert that they employ paid, unionized

employees in the Service and Maintenance Department to perform the tasks plaintiffs allege that they performed. (Ahn Decl. ¶¶ 2-4.)

A. Plaintiffs' Version of the Facts

For the purposes of the NYLL class certification motion, plaintiffs claim that they and other similarly situated persons were unpaid employees at six Food Bazaar supermarkets in Brooklyn located at (1) Wyckoff Avenue, (2) Gates Avenue, (3) Manhattan Avenue, (4) Myrtle Avenue (5) New Lots Avenue and (6) St. John's Place and at a seventh location in the Bronx at 161st Street and Grand Concourse.

1. *Wyckoff Avenue*

The testimony submitted in support of plaintiffs' class certification motion largely paints the same story. In need of a job, each of the plaintiffs consulted with named plaintiff Emanuel Suvill, who they knew as "Panama," who consulted with Jae Poong Ahn ("Mr. Ahn"), one of the store's managers, who "okayed it." (Hernandez Dep. 11:25-13:15.) Panama regularly stood outside of the Wyckoff Avenue Food Bazaar; he "hired" plaintiffs, assigned each plaintiff a shift (morning or night), and directed each plaintiff to perform various tasks, which mostly consisted of helping customers exiting Food Bazaar to load their purchases into their cars or taxis and returning their shopping carts. (Hernandez Dep. 22:21-24.) For this work, customers tipped plaintiffs, who received anywhere from $360 to $700 dollars, per week, which none of the plaintiffs reported on their taxes. (Suvill Dep. 100:9-12, $600-700 weekly; Rashan Dep. 57: 9-12, $360 weekly; Rashid Dep. 51:7-12, $300-400 weekly).

Their narratives diverge, however, on what other tasks plaintiffs performed and at whose direction. Some contend that the store managers, Mr. Ahn or Mr. Johnson, directed them, while others took direction from Carlos (a maintenance employee) or Panama. (Rashan Dep. 31-33:22;

Hernandez Dep. 21:25-23:11; Rashid Dep. 31:4-32:12.) In addition to helping customers with their bags and returning shopping carts, plaintiffs performed a variety of tasks:

Suvill testified that he worked outside the Wyckoff Avenue Food Bazaar starting in 1994 (Suvill Dep. 16:2-8.) He was "like a manager, but the manager for outside" and supervised the workers who performed duties outside, (not including the paid employees in the Service and Maintenance Department). (*Id*. at 80:19-23.) In addition to supervising the outside workers and helping customers with groceries, Suvill kept the platform clean of debris and stray shopping carts, shoveled snow, and helped apprehend shoplifters. (*Id*. at 105:21-114:12.) He scheduled his own one-hour lunch break, but notified "management" when he was stepping away. (*Id*. at 90:3-6; 143:13-20.) Mr. Ahn was Suvill's boss. (*Id*. at 113:19-21.)

Eduardo Hernandez testified that he started working at the Wyckoff Avenue Food Bazaar around 1999. (Hernandez Dep. 33-34.) At some point in the early 2000s, he worked for tips as a bagger at the direction of Mr. Johnson, inside the store, until all of the unpaid baggers were "fired." (*Id*. at 56-57.) After that, he worked outside of Food Bazaar. On several occasions, he assisted Carlos, who he considered "the assistant manager or the middleman between the manager and [outside workers.]" apprehend shoplifters. (*Id*. at 24:18-23; 68-70.) Carlos also "asked [him] to sweep[,] … to change the garbage[,] … to go check the recycling machines to see why it [*sic*] wasn't working, to change the recycling … [and t]o take out the full bag and put in the empty bag." (*Id*. at 71:2-7.) Carlos also directed him to chase away people who "just showed up and tried to work or begged [*sic*] customers [and] … people selling CDs." (*Id*. at 72:12-73:16.) "Sometimes" Hernandez painted over graffiti. (*Id*. at 22:21-23.) He was once suspended by Mr. Ahn. (*Id*. at 26:4-11.) In March 2011, Carlos notified him: "Management doesn't want you out here. You all got to go. You're fired." (*Id*. at 102:11-12.)

Rashid Beswick ("Rashid") started working at the Wyckoff Avenue Food Bazaar around 1999. (Rashid Dep. 60:17-18). He was hired by Carlos and Mr. Ahn. (*Id*. at 19:18-24.) On one occasion, he blocked the exit to help apprehend a shoplifter and twice alerted a security guard that he had witnessed shoplifting. (*Id*. at 76:3-10-78). "Probably … like ten times … in 12 years," Rashid helped to unload a truck parked in the parking lot. (Rashid Dep. 79:3-17.) He reported to Carlos, Mr. Ahn, and another Food Bazaar employee, James. (*Id*. at 46.) Rashid testified that if he was going to be late or miss work, he notified Carlos, (*Id*. at 52:20-53:9), and Carlos once suspended him for three days for arguing with a taxicab driver, (*Id*. 88:12-90:12.) In 2011, Carlos told him not to come back because the store had been robbed. (*Id*. at 17:3-12.)

Rashid's brother, Rashan Beswick ("Rashan") also testified that he worked at the Wyckoff Avenue Food Bazaar starting in 1998. (Rashan Dep. 15:13-15). Panama hired him. (*Id.* at 17:12-14.) He testified that if he was going to miss work or be late, he would call Panama to let him know. (*Id*. at 63:9-23.) "[N]o more than ten" times in 13 years, he helped to apprehend shoplifters. (*Id*. at 30:18-22.)

Peter Thomas Crowley, Jr. worked at the Wyckoff Avenue Food Bazaar since 1997. (Crowley Dep. 9:18-21.) On occasion ("a couple of times"), the Food Bazaar security guard charged with manning the bag-check asked him to man the booth while the employee "went to use the bathroom for like five minutes or something." (*Id*. at 37:2-11.) Although Crowley's declaration states that he assisted in apprehending shoplifters, he testified that "it must be a mistake … about the shoplifting thing. I never had anything to do with that." (*Id*. at 34:7-9.) Likewise, although the declaration includes "unloading freight" as one of Crowley's duties,

Crowley testified that "unloading freight really is the same thing as helping customers … with their groceries … or carrying groceries to customers' cars." (*Id*. at 35:8-25.)[1]

Suvill testified that the Wyckoff store employed "five or six [similarly situated employees] in the morning [and f]ive or six at night." (Suvill Dep. 98:7-8.) In their depositions, plaintiffs were able to identify 16 persons who worked with them at the Wyckoff Store: (1) Emanuel "Panama" Suvill, (2) Rashan "Sean" Beswick, (3) Eduardo "Eddie" Hernandez; (4) Rashid "Smokey" Beswick (5) Sandra, (6) Alan Harris or "Dread," (6) Keith Dollar or "Preacher" (7) "Lou," (8) Michael "Mike," "Mikael," or "Mikhail" Rivera, (9) Roberto/Rob, (10) "V," (11) "Biggs," (12) "Lefty," (13) "Old Man," (14) Peter Crowley, (15) Angel Rivera, and (16) Juan. (Crowley Dep. 47:12-24; Hernandez Dep. 103:23; Rashid Dep. 25:10-11; 28:7-8; Rashan Dep. 102:10-103:24; Suvill Decl. ¶¶ 5 & 8-9.) Rashid recalls that "over the last six years, no less than 20 employees have worked at Wykoff [*sic*] Avenue performing these same tasks." (Rashid Decl. at ¶8.) Rashan testified that most of these people worked "there at least five to ten years or better." (Rashan Dep. 104:13-14.)

## 2. *Gates Avenue*

Rashan testified that he worked primarily at the Wyckoff Avenue location, but also worked outside of the Gates Avenue, Manhattan Avenue, and the Bronx Food Bazaars for approximately one month, each, during their respective grand openings because grand opening sales brought extra customers and extra opportunities for tips. (Rashan Dep. 48:14-53:25.) He testified that Mr. Ahn directed him to work at those grand openings. (*Id*. at 53:14-19.) Rashan testified that: "Gates is a little … smaller [than other Food Bazaar locations], so I would say about six to twelve [people worked there] per day, like two, with the two first, I would say

---

[1] Indeed, early in his deposition, Mr. Crowley acknowledged that only "certain stuff" in his declaration was accurate because he "flew through it" when he signed it and only had sufficient time to read it the day of the deposition. (Crowley Dep. 10:2-11:20.)

maybe six to twelve, probably – I might say be a little off, but ten, let's say ten to twelve." (Rashan Dep. 52:18-22; 55:16-22.) He was able to identify 2 persons who worked with him at the Gates Avenue store: Sandra, who was also identified as a Wyckoff Avenue location employee, and Bon. (Rashan Dep. 107:11-19; Suvill Decl. ¶ 10 (recalling that "Sondra and Bon" worked at the Gates Avenue location.)

Hernandez testified that he also worked outside of the Gates Avenue Food Bazaar in the evenings, after his morning shift at the Wyckoff Avenue Food Bazaar, for about one month, after Mr. Ahn or Carlos told him "that they needed some guys over there." (Hernandez Dep. 83:8-17.) Hernandez did not speak to any managers at the Gates location. (*Id*. at 83:18-22; 86:5-20.) His duties included "calling cabs for [customers, t]aking their groceries to their cars[, and] … [performing] deliver[ies] … for one or two of them." (Hernandez Dep. 83:8-10; 91:2-9.) He testified that "five or six guys" worked with him at the Gates Avenue store during the month he spent there. In his declaration, he also states that at Gates Avenue, there were "two shifts made up of 3 to 4 workers on each shift." (Hernandez Decl. ¶ 12.)[2] Hernandez earned less money at the Gates Avenue store than he did at the Wyckoff Avenue location. (Hernandez Dep. 92:6-21, testifying that he did not earn "enough to stay more than a month.")

---

[2] Angel Rivera declared that "there were approximately 8 to 12 workers [at the Wyckoff Avenue location] every day … [and o]ver the last 6 years, no fewer than 25 employees have worked at the Wykoff [*sic*] Avenue and Gates Avenue Food Bazaars performing the same jobs I did." (Docket 25-3 ¶ 11.)

### 3. Myrtle Avenue

The only plaintiff who testified about defendants' Myrtle Avenue supermarket, called "Food Dimensions," is Crowley.[3]  Crowley testified that he worked primarily at the Wyckoff Avenue location, except for four to six months ("too long ago" to remember precisely in which year) when he worked at the Myrtle Avenue location. (Crowley Dep. 29:13-14; 30:2-21.)  At the Myrtle Avenue Food Dimensions, Crowley called cabs for customers and put their groceries in the trunk. (*Id*. at 31:8-13.)  He did not testify in his deposition or state in his declaration how many people worked with him at that location.  In his deposition, Crowley was able to identify two persons who worked with him at the Myrtle Avenue store: Sandra and Preacher, both of whom he also identified as employees of the Wyckoff Avenue location.  (*Id*. at 30:11-17.)

### 4. The Bronx and Manhattan Avenue

Rashan testified that in addition to the Wyckoff Avenue and Gates Avenue locations, he also worked outside of the Manhattan Avenue and Bronx Food Bazaars for approximately one month each, around 2001, during their respective grand openings.  (Rashan Dep. 48:14-53:25; 49:12-17; 2-9).  No plaintiff worked at the Bronx or Manhattan Avenue locations within the limitations period.  (R&R at 8.)

---

[3] Suvill testified that he knew people who worked at a store located at Myrtle and Lorimer Avenues, but later testified that he did not know anyone who worked at the location at 1102 Myrtle Avenue.  (Dep. 93 & 95.)   It is unclear to which store his testimony refers.

*5. New Lots Avenue and St. John's Place*

In a declaration submitted in opposition to Defendants' application to preclude conditional certification under 29 U.S.C. § 216(b), Michael Rivera states that he worked primarily at the Wyckoff location but "visited three other locations since 2005 located at Gates Avenue, Myrtle Avenue and a location on New Lots Avenue, all in Brooklyn" where he "personally witnessed workers performing many of the same tasks that [he] performed at Wykoff [*sic*]." (Docket 25-E.) This is the only allegation that supports the contention that similarly situated persons worked at the New Lots Avenue location.

In another such declaration, Allen ("Dread") Harris states that he worked at the Wyckoff Avenue and St. John's Place locations from approximately 2005 until November 2011. (Docket 25-D.) The rest of his declaration recounts incidents involving Carlos, the aforementioned Wyckoff Avenue Food Bazaar employee. (*Id.*) This is the only allegation that supports the contention that similarly situated persons worked at the St John's Place location.

B. <u>Defendants' Version of the Facts</u>

Defendants submitted the declarations of Carlos Mora, Pedro Chavez, and Telesforo Perez in opposition to plaintiffs' current motion. All three are employees of the Service and Maintenance Department of the Wyckoff Avenue Food Bazaar, which is the department responsible for all of the duties plaintiffs claim to have performed. Defendants have also submitted the declaration and deposition of Jae-Poong Ahn, the supervisor in the Wyckoff Avenue store who plaintiffs claim managed them.

Carlos Mora denies that he ever directed anyone who is not a Food Bazaar employee to perform any duties, and states that he has "never seen Mr. Ahn give the Plaintiffs any assignment" either. (Docket No. 43, Ex. D, Mora Decl. ¶ 1.) Rather, he states that: "[t]he truth

is that the Plaintiffs caused problems in the store because they would smoke at the door and they would also give the clients shopping carts without the management's permission. I even heard Mr. Jing tell the Plaintiffs to leave the store and that he would call the police if they didn't leave." (*Id*. ¶ 14.)

Pedro "Maldondo" Chavez affirms that: "The Plaintiffs allege that they helped me and other employees perform our duties. However, this is not true. I never … asked them to do my work or perform any of my work duties. Additionally, I never heard any of my supervisors or managers ask the Plaintiffs to do work for the store. Also, I never saw the Plaintiffs doing the work that is my duty. The only thing I saw the Plaintiffs do is help clients carry their shopping bags and take them to their cars and return the shopping carts to the store platform, which is something that clients always do by themselves." (Docket No. 43, Ex. E, Chavez Decl. ¶ 11.)

Telesforo Perez states that he "never saw or heard [his] supervisor[s], either Mr. Ahn or Mr. Johnson, asking other people to perform [his] work duties," and that "Plaintiffs allege that they helped [him] and other employees perform the[ir] duties [but he] would not let persons who are not store employees perform any part of [his] work. What's more, when [he] used to see that the Plaintiffs tr[y] to do [his] work, [he] would tell them that it was [his] work and ask them to leave." ((Docket No. 43, Ex. F, Perez Decl. ¶¶ 11-12.)

Jae-Poong Ahn testified that he is the Service and Security manager of the Wyckoff Avenue Food Bazaar and manages the clerical and security personnel at the store who are responsible for the duties plaintiffs' allegedly performed. (Docket No. 43, Ex. J, Ahn Decl. ¶¶ 1-2.) He states that although "plaintiffs claim that I or another Food Bazaar employee assigned them duties such as: sweeping and removing litter from outside of the store; shoveling snow/applying salt; emptying garbage cans; putting carts back in the cage; helping with the bag

check booth; cleaning carts and assist in apprehending shop lifters[, t]his is not true." (*Id*. ¶ 4.)

Rather, "Food Bazaar has union-represented employees who perform all of these functions."

(*Id*.) Further, he denies that he ever asked plaintiffs to perform "any of the above duties or any

other duties that they allege to have been assigned because they were not employees of the

store." (*Id*. ¶ 5.) He explains "on many occasions" he asked plaintiffs "to pick [up] their trash,

such as cigarette butts and food wrappers, when [he] saw them littering" and he "would ask the

same thing of anyone, including customers, who litter in front of the store." (*Id*. ¶ 10.)

Ahn denies that he hired plaintiffs to work at the Wyckoff Avenue Food Bazaar, and

indeed, explains that he "did not have the authority hire or fire anyone when [he] worked at the

Wyckoff store - only the store manager hires or fires employees. If [plaintiffs] had asked [him]

for a real job, [he] would have told them to speak with the store manager and fill out an

employment application, like everyone else who applies for a job at Food Bazaar. They also

would have been required to join the union." (*Id*. ¶ 6.) He denies that he "provided any of the

plaintiffs with tools or uniforms, including brooms, gloves, rain jackets or any other tools or

items of clothing." (*Id*. ¶ 11.) Rather, because the Wyckoff Avenue Food Bazaar keeps certain

maintenance items outside, occasionally plaintiffs tried to help employees, but Ahn expressly

"instructed employees who reported to [him] that they were not to permit plaintiffs to assist them

in performing any of their duties." (*Id*. ¶ 5.) He further denies that he ever "transferred" any of

plaintiffs to other Food Bazaar stores during grand openings. (*Id*. ¶ 9.) Further, he states that he

"never ask[ed anyone] … who does not work for Food Bazaar[] to assist in apprehending

[shoplifters], … [n]ever scheduled any of the plaintiffs to work, because they did not work for

Food Bazaar[,] … never provided [his] telephone number to Mr. Suvill or any of the other

plaintiffs[,] and never asked Mr. Suvill to let [him] know when he would be hanging around the

store or to let [him] know if he was sick and would not be hanging around outside of the store." (*Id.* ¶¶ 12-14.)

Mr. Ahn testified that he "told people who work outside not to come into the store and that was also the company regulation." (Ahn Dep. 127:23-25.) Mr. Ahn states that he "called [the] police on a regular basis because plaintiffs would get into fights with other individuals or harass … customers. Unfortunately, by the time the police arrived, plaintiffs would leave the premises, but return a short while later." (Ahn Decl. ¶ 7.) He recalls taking a photo of one plaintiff, "Beswick," (either Rashid or Rashan), "to provide it to the police because [he] wanted them to arrest [Beswick] for trespassing on [Food Bazaar] property and needed to identify him. [Mr. Ahn] did this after [he] caught [Beswick] trying to steal from the store and because [Beswick] assaulted one of [Food Bazaar's] employees." (*Id.* ¶ 8; Ahn Dep. 114:20-115:25.)

## III.    Procedural History

Plaintiffs commenced this putative class action on July 13, 2011, alleging violations of FLSA and NYLL. They estimate that over 50 workers performed similar tasks at the seven Food Bazaar locations in New York and were not paid any wages for their work. (Docket No. 40, "Lusher Decl." ¶ 3.) Now before the court is plaintiffs' motion for certification of a class of plaintiffs pursuing violations of NYLL and consisting of:

> All individuals who performed work at the entrances, on outdoor platforms and around the exterior perimeter Food Bazaar locations, performing tasks that include and are not limited to: helping customers with their groceries, removing snow and ice, cleaning the platform and parking lots, assisting security personnel, taking deliveries, cleaning debris and trash, and collecting shopping carts, from February 22, 2006 through the present. This does not include supervisors, officers, executive, managerial, or administrative personnel.

Defendants objected for a host of reasons, primarily having to do with the difficulty in verifying whether each putative plaintiff is part of the class. Defendants argued that fact-intensive mini-

trials would be required because there are no objective criteria, such as payroll or tax records, to

verify plaintiffs' alleged employment. They also argued that the proposed class definition had

no limiting principle, insofar as customers and union employees at any of Food Bazaar's

seventeen stores could fall within its ambit. On August 12, 2013, the Magistrate Judge issued an

R&R recommending that this Court grant class certification and modifying the class definition in

light of Food Bazaar's objections as bolded in the following:

> All individuals who performed work for Defendants at the entrances, on outdoor platforms and around the exterior perimeter of the Food Bazaar locations **at Wyckoff Avenue (Brooklyn), St. John's Place (Brooklyn), Gates Avenue (Brooklyn), Myrtle Ave (Brooklyn), New Lots Avenue (Brooklyn), Manhattan Avenue (Brooklyn) and 161st Street-Grand Concourse (Bronx)**, performing tasks that include and are not limited to: helping customers with their groceries, removing snow and ice, cleaning the platform and parking lots, assisting security personnel, taking deliveries, cleaning debris and trash, and collecting shopping carts, from **July 13, 2005** through the present**, and were not paid minimum wage or overtime wages**. This does not include supervisors, officers, executive, managerial, **unionized employees** or administrative personnel.

The gist of Food Bazaar's objections to the R&R is that because Food Bazaar does not

maintain any payroll records of who worked for tips outside of its stores, the court will be

required to conduct individualized inquiries with respect to each potential plaintiff's inclusion in

the class. Moreover, because Food Bazaar's defense to plaintiffs' claims is that none of the

plaintiffs' were employees, as defined by NYLL, the court will have to conduct individualized

inquiries at the liability phase to determine whether plaintiffs are even protected by NYLL.

Thus, defendants argue, the individualized nature of plaintiffs' claims defeats the commonality

and typicality prongs of Rule 23(a) and the predominance requirement of Rule 23(b)(3). The

Court agrees and, for the following reasons, denies plaintiff's motion for class certification.

### IV.    Discussion

#### A.  <u>Declarations</u>

As a preliminary matter, the Court hesitates to give weight to those assertions in the declarations submitted by plaintiffs' counsel that have not been corroborated by deposition testimony because similar statements in the declarations have proven inaccurate and many of these assertions are not based on personal knowledge.  The proponent of Rule 23 class certification must present "enough evidence, by affidavits, documents, or testimony" to satisfy this Court, by a preponderance of the evidence, that each of the Rule 23 elements has been met. *In re Initial Pub. Offerings Secs. Litig.,* 471 F.3d 24, 40–41 (2d Cir. 2006).  Here, during depositions in this matter, a number of the "cookie cutter" declarations submitted earlier in the litigation by plaintiffs in opposition to defendants' application to preclude conditional certification under 29 U.S.C. § 216(b) have been proven inaccurate. *See Damassia v. Duane Reade, Inc.,* 250 F.R.D. 152, 160 (S.D.N.Y. 2008) (assigning "little weight" to written declarations that contradicted deposition testimony).  For example, in his deposition, Hernandez testified that he worked primarily at the Wyckoff Avenue Food Bazaar and "also worked at Gates[, a]nd although it says the Bronx there [in the declaration], I never worked at the Bronx." (Hernandez Dep. 7:20-23.)  Likewise, in testifying about their duties, as recited in their declarations, Rashan testified that "my lawyers probably got that wrong.  I never did no [*sic*] freight," (Rashan Dep. 66:15-24) and Crowley testified that "[i]t must be a mistake in there about the [apprehending] shoplift[ers].  I never had anything to do with that," (Crowley Dep. 34:7-9).  Indeed, after catching a number of such errors, Crowley admitted that when he signed his declaration, he "flew through it" and he only had an opportunity to read the declaration carefully on the day of his deposition.  (Crowley Dep. 10:3-11:11.)  Moreover, the declarations contain

many statements that are not based on personal knowledge. *See Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 64 (E.D.N.Y. 2012) ("[A]fter reviewing Second Circuit case law addressing the evidentiary standards applicable to Rule 23 motions, this Court is of the opinion that the Second Circuit would require that such declarations be admissible (i.e., based on personal knowledge and either non-hearsay or information subject to hearsay exceptions)."); *see also Versteeg v. Bennett, Deloney & Noyes, P.C.*, 271 F.R.D. 668, 671 (D. Wyo. 2011) (declining to consider those portions of an affidavit submitted in support of Rule 23 motion that are "unsupported assertions," as opposed to those "based on personal knowledge"). For example, Harris, who only worked at the Wyckoff Avenue and St. John's Place Food Bazaars, asserts that "[e]very Food Bazaar location employs approximately 8 to 12 workers every day," totaling "no fewer than 100 employees" over the last six years. (Docket 25-4, Harris Decl. ¶ 14.) *See Eash v. Exp. Packaging Co., Inc.*, 09-CV-1217, 2010 WL 3724770 (C.D. Ill. Sept. 15, 2010) (concluding that plaintiffs failed to establish numerosity where declarations asserted that 225 persons were similarly situated employees because it is "hard to believe" that declarants, former employees, "would be intimately familiar with the work status of over 200 of Defendant's employees").

      B.  Rule 23(a)

"Rule 23 does not set forth a mere pleading standard." *Wal–Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011). The party seeking class certification must establish, by a preponderance of the evidence, that each of the Rule 23 requirements are met, *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010), and a district court may only certify a class if, "assess[ing] all of the relevant evidence admitted at the class certification stage," *In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006), it "is satisfied, after a rigorous analysis," that the proponent has met that burden, *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S.

147, 161 (1982)).  *See also In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 237-38 (2d Cir. 2012).  As the Supreme Court has noted, "[f]requently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped."  *Wal–Mart Stores,* 131 S.Ct. at 2551; *see also In re IPO,* 471 F.3d at 41 (holding that "the obligation to make [Rule 23] determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement").  That said, "[a] motion for class certification should not . . . become a mini-trial on the merits."  *Lewis Tree Serv., Inc. v. Lucent Techs.*, 211 F.R.D. 228, 231 (S.D.N.Y. 2002).  "The dispositive question is not whether the plaintiff has stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."  *Kowalski v. YellowPages.com, LLC*, 2012 WL 1097350, at *12 (S.D.N.Y. Mar. 31, 2012) (quoting *Lucent Techs.*, 211 F.R.D. at 231).  In sum, the Court's task at the Rule 23 stage is not to resolve the liability question, but to decide "whether the constituent issues that bear on [Defendants'] ultimate liability are provable in common." *Myers*, 624 F.3d at 549.

In order to obtain class certification under Federal Rule of Civil Procedure 23, a putative class must meet all four prerequisites of subsection 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.  *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201-02 (2d Cir. 2008).  In addition, while Rule 23(a) does not expressly require that a class be definite in order to be certified, "[t]here is an implied requirement that the membership of the class is identifiable and ascertainable." *Jankowski v. Castaldi*, 2006 WL 118973, at *5 (E.D.N.Y. Jan. 13, 2006) (citation omitted).  "The Second Circuit has emphasized that Rule 23 should be given liberal rather than restrictive construction, and it seems beyond peradventure that the Second Circuit's general preference is for granting

rather than denying class certification."  *Gortat v. Capala Bros., Inc*., 257 F.R.D. 353, 361

(E.D.N.Y. 2009)).

Regarding commonality, in *Wal–Mart Stores, Inc. v. Dukes*, the Supreme Court explained

that "[w]hat matters to class certification ... is not the raising of common questions—even in

droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to

drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the

potential to impede the generation of common answers."  131 S.Ct. 2541, 2551 (2011) (ellipsis

and emphasis in original) (internal quotation marks and citations omitted).  After *Dukes*,

commonality can be established in wage-and-hour and misclassification cases, but not by merely

reciting that plaintiffs' injuries are all derived from the same violation of labor law.  Rather,

although workers' individual circumstances may differ, there must be a unifying thread stitching

their claims together *which is susceptible to a common determination.  See Meyer v. U.S. Tennis

Ass'n*, 11 civ 6268, 2013 WL 1777556, *6 (S.D.N.Y. 2013) ("[C]ommonality does not require

plaintiffs to show that class members perform identical duties … [but r]ather, the putative class

members must have largely consistent duties, which lend themselves to common

determinations."); *compare White v. W. Beef Properties, Inc.,* No. 07 Civ. 2345 (RJD) (JMA),

2011 WL 6140512, at *5 (E.D.N.Y. Dec. 9, 2011) (denying class certification because

employees "span[ned] nine different departments—Meat, Produce, Frozen, Fish, Grocery,

Bakery, Deli, Dairy and Receiving—each of which has a distinct set of concerns and job duties"

and there was no "standardized company-wide description of responsibilities"), *with Morris v.

Alle Processing Corp.*, 08CV-4874 JMA, 2013 WL 1880919, *9-10 (E.D.N.Y. May 6, 2013)

(Where employees claims arose from the same course of conduct and official company-wide

policy, "[d]ifferences among class members as to the number of hours worked, the type of work

performed, and the amount of pay received 'concern the amount of damages to which any individual [class member] might be entitled if and when liability is found, not the amenability of plaintiffs' claims to the class action form.') (internal citation omitted).

Because plaintiffs have not demonstrated that class members share *relevant* common "questions of law or fact," Fed. R. Civ. P. 23(a), the commonality prong is not met and class certification is denied. Plaintiff contends that common questions abound: Did defendants pay plaintiffs (1) minimum wage and (2) overtime (3) for all of the hours they worked (4) in accordance with NYLL? (Docket 42, Pls.'s Rule 23 Br. at 12). But Food Bazaar does not dispute that it did not pay plaintiffs a single penny for any hour worked. Answering plaintiffs' 'common questions' will not move this litigation along. *Dukes*, 131 S.Ct. at 2551 ("determination of [the] truth or falsity [of a common question must] resolve an issue that is central to the validity of each one of the claims in one stroke"). Rather, Food Bazaar argues that none of the plaintiffs was ever an employee under NYLL. [4]

Under NYLL, the existence of an employment relationship is a fact-intensive analysis turning on "the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198, 770 N.Y.S.2d 692, 802 N.E.2d 1090 (2003). The New York Court of Appeals has articulated five factors relevant to determining control: whether the worker (1) worked at his/her own convenience; (2) was free to engage in other employment; (3) received fringe benefits; (4) was on the employer's payroll; and (5) was on a fixed schedule. *Id*. These factors are not exhaustive and New York courts commonly consider additional factors such as whether the worker was

---

[4] The merits of defendants' defense is beyond the scope of the class certification motion. "The merits can, and do, affect class certification, in the sense that merits questions and certification questions tend to overlap, but a premature inquiry into the merits should not serve as the *sine qua non* of a putative class's certification." *Meyer*, 2013 WL 1777556.

required to wear a uniform, follow company procedures, attend meetings, sign in and out of work, and coordinate vacation with a supervisor, *Murphy v. ERA United Realty,* 251 A.D.2d 469, 470–71 (2d Dep't 1998) and whether the employer decided when each task should be started and on which task the worker should focus at any particular time, *E. Coast Indus., Inc. v. Becconsall,* 60 Misc.2d 84, 301 N.Y.S.2d 778, 779–80 (N.Y. Dist. Ct. 1969).

In *Hart v. Rick's Cabaret Int'l, Inc.*, a case similar on the surface to the one currently before the Court, the United States District Court for the Southern District of New York determined that class members who undisputedly performed the exact same job – exotic dancing – and were all subject to the same official, company-wide employment policies – "micromanagement" of nearly all aspects of dancers' conduct, dress, and performance style – were employees under NYLL. 09 CIV. 3043 PAE, 2013 WL 4822199, at *18-19 (S.D.N.Y. Sept. 10, 2013). In *Hart*, the court did not need to conduct any individualized inquiries into whether any particular dancer or subclass of dancers was subject to different rules or performed different duties. They all worked at the same location for the same managers and were subject to the same very specific rules controlling nearly all aspects of their work.

By contrast, here, there are relevant differences between the individual workers. While all members of the class allegedly stood outside Food Bazaar's stores and helped customers unload their shopping carts, the extent of Food Bazaar's control over plaintiffs clearly differed from store-to-store and plaintiff-to-plaintiff. For example, while Suvill notified Mr. Ahn if he planned to go on vacation, (Suvill Dep. 102:13-16), Rashan only told Suvill if he planned to be out, (Rashan Dep. 20:2-9), and Rashid called Carlos if was going to be absent or late (Rashid Dep. 52:20-23.) Moreover, although plaintiffs present a wealth of testimony aimed at establishing the existence of an employment relationship between the Wyckoff Avenue Food Bazaar and the

workers who assisted customers in front of that store, there is little testimony suggesting that a similar relationship existed at the other Food Bazaar locations and no evidence to support a finding of a company-wide policy of employing unpaid outside workers. *See Espinoza v. 953 Associates LLC*, 280 F.R.D. 113, 126 (S.D.N.Y. 2011) (excluding from class definition employees of a second restaurant location because plaintiffs failed to establish that those employees were similar where the two restaurants were run by separate and entirely independent management teams and plaintiffs).[5] The allegation that Rivera visited the New Lots Avenue and Myrtle Avenue locations and witnessed workers helping customers with their purchases does not establish commonality. Nor does the allegation that Harris worked at the St. John's Place location, in addition to the Wyckoff location, while the balance of his declaration focuses solely incidents that took place at the Wyckoff location.[6] None of the plaintiffs testified to their

---

[5] While a class consisting only of persons working at the Food Bazaar at Wyckoff Avenue might satisfy the commonality requirement, such a class would fail to satisfy the numerosity requirement of Rule 23(a) because the testimony supports an estimate that, at most, 20 people worked at the Wyckoff Avenue Food Bazaar.

[6] Plaintiffs contend that each plaintiff worked at Food Bazaar's stores performing a smattering of similar low-skill tasks and the differences among the plaintiffs as to the number of hours worked and the precise nature of their work will merely affect their damages, if and when liability is found. (Pls.s' Br. at 11 (citing *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 86 (S.D.N.Y. 2001)). However, these differences also go to whether any putative class member had an employment relationship with Food Bazaar. A plaintiff who was suspended from work or directed to work at another location is in a different position from one who scheduled his own vacations and came and went as he pleased. *See e.g.*, *Tracy v. NVR, Inc.*, 293 F.R.D. 395 (W.D.N.Y. 2013) (Although plaintiffs allege that the basis for their claims is a uniform set of job duties, the evidence … shows that [some plaintiffs] performed different subsets of job duties …[and b]ecause the plaintiffs' claims pertain to different [plaintiffs] in different locations, under different managers, who performed duties outside of their offices to varying degrees and in different ways, the plaintiffs' claims—as well as any determinations to be made concerning damages—are too highly individualized to form the basis for a class action.").

relationship with any other Food Bazaar store managers.[7]

The Magistrate Judge concluded that defendants' defense presents a common question capable of classwide resolution. However, there is no evidence suggesting that the employment relationship (or lack thereof) between plaintiffs and the Wyckoff Avenue Food Bazaar resulted from a company-wide policy, or even that a similar relationship existed between workers and other Food Bazaar locations. Thus, Food Bazaar's common defense – that none of the plaintiffs is a Food Bazaar employee – will require an individualized inquiry into the circumstances of each plaintiff's work and his or her relationship with Food Bazaar's many managers. Accordingly, plaintiffs' class certification motion is denied.

Although the court need not reach the question of whether plaintiffs have established the other requirements of Rule 23(a) or Rule 23(b)(3), for the aforementioned reasons, plaintiffs have also failed to meet their burdens under Rule 23(a) to demonstrate typicality and under Rule 23(b)(3) to demonstrate predominance. *See Vu v. Diversified Collection Servs., Inc.*, 293 F.R.D. 343, 354 (E.D.N.Y. 2013) (explaining that the "'typicality requirement tends to merge with the commonality requirement' since '[b]oth serve as guideposts for determining whether ... the named plaintiff's claim and the class claims are so interrelated that the interest of the class members will be firmly and adequately protected in their absence.'" (citations omitted)); *Ansoumana*, 201 F.R.D. at 89 ("The predominance criterion [of Rule 23(b)(3)] is, in effect, a stricter version of the commonality requirement of Rule 23(a)(2). If common issues do not predominate over individual factual issues, a class action is 'not a superior method for fair and efficient adjudication.").

_____

[7] Hernandez testified that Mr. Ahn's wife worked at the Gates Avenue Food Bazaar, but she did not manage him during his tenure at that store; Mr. Ahn at the Wyckoff store did. (Hernandez Dep. 86:2-11.)

### V.    CONCLUSION

For the reasons set forth above, the Court declines to adopt the R&R and denies plaintiffs' motion for class certification.


**SO ORDERED.**


_____S/_____

SANDRA L. TOWNES
United States District Judge


Brooklyn, New York
Dated: September 30, 2014